MINPECO, S.A., Plaintiff,

v.

CONTICOMMODITY SERVICES, INC., Conticapital Management, Inc., Conticapital Limited, Norton Waltuch, Nelson Bunker Hunt, Lamar Hunt, William Herbert Hunt, International Metals Investment Co., Ltd., Sheik Mohammed Aboud Al–Amoudi, Sheik Ali Bin Mussalem, Naji Robert Nahas, Gilion Financial, Inc., Acli International Commodity Services, Inc., Banque Populaire Suisse, Advicorp Advisory and Financial Corporation, S.A., Mahmoud Fustok, Merrill Lynch, Pierce, Fenner & Smith, Inc., Bache Halsey Stuart Shields, Inc., E.F. Hutton & Company, Inc., Commodity Exchange Inc., The Board of Trade of the City of Chicago, Continental Company, and Walter Goldschmidt, Defendants.

No. 81 Civ. 7619 (MEL).

United States District Court,
S.D. New York.

Jan. 6, 1988.

Curtis, Mallet–Prevost, Colt & Mosle, New York City (Herbert Stoller and Turner P. Smith, of counsel), for defendant Mahmoud Fustok.

Arnold & Porter, Washington, D.C. (Daniel Waldman and Brooksley Born, of counsel), and Gilbert, Segall and Young, New York City, for defendant Banque Populaire Suisse.

LASKER, District Judge.

In this action, alleging a conspiracy to manipulate upward the price of silver and silver futures, Banque Populaire Suisse ("BPS") has moved to dismiss, or alternatively for summary judgment dismissing, the cross-claims of defendant Mahmoud Fustok ("Fustok"). After Fustok filed his cross-claims against BPS for contribution and indemnity of any damages he might be ordered to pay, BPS settled with plaintiff Minpeco. BPS argues that the legal effect of the settlement and principles of law restricting contribution and indemnity require dismissal of Fustok's cross-claims. Fustok contends in response that the motion must be denied, as it requires the court to decide "issues of fact and law in advance of trial". Fustok's Memorandum in Opposition to the Motion of Banque Populaire Suisse to Dismiss or For Summary Judgment at 3 (September 3, 1987) ("Fustok Memorandum").

The claims against Fustok, and thus his cross-claims against BPS, both for contribution and for indemnity, arise under federal and state law, including claims under the federal antitrust laws (Sections 1 and 2 of the Sherman Act, 15 U.S.C. § 1–2; Section 4 of the Clayton Act, 15 U.S.C. § 15); the Racketeer Influenced and Corrupt Organization Act ("RICO") (18 U.S.C. § 1961 et. seq.); the Commodity Exchange Act ("CEA") (7 U.S.C. § 13(b), 6(b)); § 340 of the Donnelly Act, N.Y.Gen.Bus.Law § 340, the New York antitrust statute; § 352–c of New York's Martin Act for fraud and misrepresentation [1], N.Y.Gen.Bus.Law § 352–c; and for fraud under the New York common law.

I conclude that § 15–108 of New York General Obligations Law bars Fustok's cross-claims for contribution on the state law cause of action; that federal law precludes contribution under the federal antitrust laws and RICO; and that, under the principles articulated in *First Federal Savings & Loan v. Oppenheim, Appel, Dixon & Co.*, 631 F.Supp. 1029 (S.D.N.Y.1986), the

---

1. The cross-claims under the Martin Act for contribution and indemnity must be dismissed, because Minpeco's claims under the Martin Act were dismissed as to all defendants by endorsement dated November 9, 1987.

cross-claims for contribution arising under the CEA must also be dismissed. The terms of the settlement agreement, which bar Minpeco from holding Fustok vicariously liable solely for the acts of others, obviate the need for and the basis underlying Fustok's cross-claims for indemnity from BPS. BPS' motion for summary judgment is granted.

## I. FUSTOK'S CROSS–CLAIMS FOR CONTRIBUTION

BPS advances three arguments to support its proposition that Fustok's cross-claims for contribution must be dismissed: 1) the New York release statute, Gen. Oblig. Law § 15–108, bars Fustok's right to contribution under the state claims, 2) there is no right to contribution under the federal antitrust laws, RICO, and the CEA, and 3) the ruling in *First Federal* bars the cross-claims for contribution. Fustok, in response, contends that 1) he "may have a right of contribution from BPS on Minpeco's state law claims because of its vicarious liability for the conduct of Advicorp," Fustok Memorandum at 12, 2) "he may have a right of contribution from BPS" under the CEA, Fustok Memorandum at 10, and 3) *First Federal* does not bar his cross-claims for contribution since the settlement between BPS and Minpeco was not, as in *First Federal*, fair nor free of collusion.

### A.

The settlement agreement between Minpeco and BPS provides for the dismissal with prejudice of plaintiff's claims against BPS, the exchange of releases between the parties, and payment of $9,500,000 to Minpeco, all but $50,000 specified as compensation for release of Minpeco's claim for compensatory damages under the Clayton Act.[2]

N.Y.Gen.Oblig.Law § 15–108(b) (McKinney 1978), which applies to the settlement between Minpeco and BPS,[3] states:

A release given in good faith by the injured person to one tortfeasor as provided in subdivision (a) [stating that a release given to one tortfeasor does not discharge others but it reduces the liability by the greatest of the amount stipulated in the release, the consideration paid, or the released tortfeasor's equitable share of damages] relieves him from liability to any other person for contribution as provided in article fourteen of the civil practice law and rules.

Although the language of the statute refers to torts, it has been interpreted to bar claims for contribution arising under common law fraud and state securities fraud statutes. *First Federal Savings & Loan v. Oppenheim, Appel, Dixon & Co.*, 631 F.Supp. 1029 (S.D.N.Y.1986); *Primoff v. Duell*, 85 Misc.2d 1047, 381 N.Y.S.2d 947 (Sup.Ct.1976).

Fustok does not dispute that the law bars contribution from settling defendants arising under the claims of this case or that he is prevented by law from directly seeking contribution from BPS. He argues instead that he is still entitled to contribution from BPS on Minpeco's state law claims because BPS is vicariously liable for the action of another defendant, Advicorp, which has not settled and from whom Fustok is entitled to contribution. He cites no law to support this proposition.

Fustok is correct that he is still entitled to contribution from Advicorp, but incorrect in assuming that he is then entitled to contribution from BPS if it is proven that BPS controlled Advicorp.[3a] First, Fustok's

---

**2.** As Fustok emphasizes, Minpeco, rather than BPS, has the greatest stake in this motion: in the settlement, Minpeco agreed to indemnify BPS against any judgment for contribution or indemnity obtained by a remaining defendant.

**3.** The parties to this motion do not dispute that New York law, and thus N.Y.Gen.Oblig. § 15–108, applies in this action. Were there a choice of law question, the interest analysis and determination that New York law governed of

*First Federal Savings & Loan v. Oppenheim, Appel, Dixon & Co.*, 631 F.Supp. 1029, 1032–34 (S.D. N.Y.1986), would apply here.

**3a.** His argument, although based on BPS' vicarious liability for the acts of Advicorp, sounds in contribution, not indemnity. He is not trying to shift his entire loss, the principle of indemnity, but he instead wants to retain the right to collect from BPS for Advicorp's share of any action for which he is held liable. The nature of the

argument is not supported by case law. Gen.Oblig.Law § 15–108 has been construed to bar contribution from a settling defendant, even if that defendant is vicariously liable for a nonsettling defendant. *Mead v. Bloom,* 94 A.D.2d 423, 464 N.Y.S. 2d 904, 905 (App.Div.1983), *aff'd,* 62 N.Y.2d 788, 477 N.Y.S.2d 326, 465 N.E.2d 1262 (1984).[4] Second, Fustok's argument is inconsistent with the language and purpose of the release statute. Section 15–108 states that a release relieves the settling party from "liability to *any* other person for contribution." (emphasis added). One of, if not the, major purpose of the statute —to encourage settlement between plaintiffs and defendants, *Purcell v. Doherty,* 102 Misc.2d 1049, 424 N.Y.S.2d 991, 994 (Sup.Ct.Sp.T.Bronx Co. 1980), *aff'd mem.,* 80 A.D.2d 755, 437 N.Y.S.2d 993 (1981), *aff'd,* 55 N.Y.2d 985, 449 N.Y.S.2d 186, 434 N.E.2d 255 (1982); *Roma v. Buffalo General Hospital,* 103 A.D.2d 606, 481 N.Y.S. 2d 811, 812 (App.Div.1984)—would be defeated were the statute to be construed not to extinguish the settling party's liability for contribution to all co-defendants. Accordingly, § 15–108(b) bars Fustok's cross-claims against BPS for contribution, whether the claims are based on the actions of BPS or Advicorp acting as its agent.

There remains, however, the question whether Fustok may maintain his cross-claims for contribution arising under the federal laws. BPS argues that those cross-claims must be dismissed, because there is no right to contribution under the relevant statutes and because of the *First Federal* ruling.

### B.

■ As a matter of law, Fustok has no right to contribution under the federal antitrust statutes and RICO. The cross-claims for contribution under the federal antitrust

statute must be dismissed pursuant to *Texas Industries, Inc. v. Radcliff Materials, Inc.,* 451 U.S. 630, 101 S.Ct. 2061, 68 L.Ed. 2d 500 (1981), in which the court held that there is no right to contribution under the Sherman and Clayton Acts.

■ Applying the analysis of *Texas Industries* to RICO, as have the other courts that have addressed the question, leads to the conclusion that there is no right to contribution under RICO.[5] *Jacobson v. Western Montana Production Credit Ass'n,* 643 F.Supp. 391, 396 (D.Mont.1986); *Seminole Electric Cooperative, Inc. v. Tanner,* 635 F.Supp. 582, 584 (M.D.Fla. 1986); *In re Olympia Brewing Co.,* No. 77C 1206 (D.Ill. March 27, 1986); *Miller v. Affiliated Financial Corp.,* 624 F.Supp. 1003, 1004 (N.D.Ill. 1985); *Boone v. Beacon Bldg Corp.,* 613 F.Supp. 1151, 1155 (D.N.J.1985). According to *Texas Industries,* the right to contribution arises in either of two ways: "first, through the affirmative creation of a right of action by Congress, either expressly or by clear implication; or second, through the power of the federal courts to fashion a federal common law of contribution." 451 U.S. at 638, 101 S.Ct. at 2066.

First, absent an express provision for contribution under RICO, it is necessary to determine whether Congress intended there to be an implied right to contribution. In fact, a treble damage provision, such as contained in RICO, has been held to indicate Congressional intent that there should be no right to contribution. The Supreme Court, in *Texas Industries,* when analyzing the implication of the treble damage provision of the federal antitrust statutes, stated:

The very idea of treble damages reveals an intent to punish past, and to deter future, unlawful conduct, not to ameliorate the liability of wrongdoers. The

---

argument is important since § 15–108 does not bar claims for indemnity from settling tortfeasors.

**4.** The principal case cited by the dissent, on appeal, in *Mead* is not to the contrary. In *Riviello v. Waldron,* 47 N.Y.2d 297, 418 N.Y.S.2d 300, 305, 391 N.E.2d 1279, 1283 (1979), the court held that, under § 15–108, plaintiff's release of a

negligent employee does not bar his action against the employer on the theory of vicarious liability. At issue in this case, however, is a defendant's claim for contribution, not a plaintiff's claim.

**5.** Fustok does not argue to the contrary.

absence of any reference to contribution in the legislative history or of any possibility that Congress was concerned with softening the blow on joint wrongdoers in this setting makes examination of other factors unnecessary.

451 U.S. at 639, 101 S.Ct. at 2066 (citations omitted). Moreover, Fustok's status as a defendant in this case, especially in light of the decision in *Minpeco, S.A. v. ContiCommodity Services, Inc.*, 673 F.Supp. 684 (S.D.N.Y.1987) (dismissing Fustok's motion for summary judgment), suggests that, rather than being a party whom Congress sought to benefit by enactment of RICO, he is alleged to be "a member of the class whose activities Congress intended to regulate for the protection and benefit of an entirely distinct class." *Texas Industries*, 451 U.S. at 639, 101 S.Ct. at 2066. (citing *Piper v. Chris–Craft Industries, Inc.*, 430 U.S. 1, 37, 97 S.Ct. 926, 947, 51 L.Ed.2d 124 (1977)).

■ Second, for a court to have the power to fashion a federal common law of contribution, a federal rule must exist which protects a uniquely federal interest or Congress must have given the courts the power to develop substantive law. *Texas Industries*, 451 U.S. at 640, 101 S.Ct. at 2066. RICO, although reflecting Congress' interest in providing creative federal responses to the problems of organized crime, does not address a uniquely federal interest. The analysis of the *Texas Industries* court, when considering whether the antitrust statutes protected a narrow area concerned with the rights and obligations of the United States, is applicable here.

[A] treble damages action remains a private suit involving the rights and obligations of private parties. Admittedly, there is a federal interest in the sense that vindication of rights arising out of these congressional enactments supplements federal enforcement and fulfills the objects of the statutory scheme. Notwithstanding that nexus, contribution among [racketeering] wrongdoers does not involve the duties of the Federal Government, the distribution of powers in our federal system, or matters necessarily subject to federal control even in the absence of statutory authority.

451 U.S. at 642, 101 S.Ct. at 2068 (citation omitted). Under RICO, as under the antitrust statutes, "contribution does not implicate 'uniquely federal interests' of the kind that oblige courts to formulate federal law." *Id.* at 642, 101 S.Ct. at 2068. In addition, as is true with the antitrust statutes, there is no indication that in the RICO statute Congress empowered federal courts to develop substantive law. As with the antitrust laws, the expansive scope of RICO is balanced by specific remedies, including the statutory provision of treble damages. Without any indication in the legislative history or remedial scheme, which neither Fustok nor other courts that have considered the question have found, that Congress intended courts to have the power to alter or supplement the remedies enacted, there is no support for the proposition that the courts are empowered to create a federal common law of contribution under RICO.

### C.

■ BPS maintains that, using the analysis of *Texas Industries, Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981), there is no right to contribution under the CEA, whereas Fustok urges the court to find such a right by analogy to decisions holding that there is an implied right to contribution under the federal securities laws. However, it is not necessary to reach this question of first impression, because the analysis of *First Federal* bars Fustok's cross-claims for contribution.

In *First Federal*, N.Y.Gen.Oblig.Law § 15–108 barred the third-party plaintiffs' claims for contribution against a settling third-party defendant. When confronted with the remaining question whether the party was entitled to contribution under the federal securities act, it was held that, in the absence of a settled federal policy whether a party was entitled to contribution from a settling defendant, that N.Y. Gen.Oblig.Law § 15–108 should be adopted as the rule of decision. The rationale of *First Federal* applies in the present con-

text and requires the dismissal of Fustok's cross-claim.

First, the goal of the CEA, to "insure fair practice and honest dealing on the commodity exchanges and to provide a measure of control over those forms of speculative activity which too often demoralize the markets to the injury of producers and consumers and the exchanges themselves," *Leist v. Simplot,* 638 F.2d 283, 305 (2d Cir.1980) (citing H.R.Rep. No. 421, 74th Cong., 1st Sess. 1 (1935)), *aff'd sub nom., Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982) and its scheme to promote self-regulation as well as enforcement by injured private parties, *Leist,* 638 F.2d at 308–09, are compatible with the New York release statute's purpose. The goals of Gen.Oblig.Law § 15–108 are:

(1) to rekindle the incentive for settlement between plaintiffs and defendants, while at the same time (2) ensuring that the nonsettling tortfeasor not be burdened with more than his equitable share of liability because of the fact that another tortfeasor has chosen to settle (*Mielcarek v. Knights,* 50 A.D.2d 122, 126, 375 N.Y.S.2d 922, 925 [4th Dept. 1975]). (see, Report of the Law Revision Commission, Leg.Doc. [1972], No. 65[k]).

*First Federal,* 631 F.Supp. at 1032 (quoting *Purcell v. Doherty,* 102 Misc.2d 1049, 1053, 424 N.Y.S.2d 991, 994 (Sup.Ct.Sp.T.Bronx Co. 1980), *aff'd mem.,* 80 A.D.2d 755, 437 N.Y.S.2d 993 (1st Dept. 1981), *aff'd,* 55 N.Y.2d 985, 449 N.Y.S.2d 186, 434 N.E.2d 255 (1982)). The purposes of the two laws are particularly compatible given the concern of Congress, when adopting amendments to the CEA in 1974, that the exchange rules be reduced so as to reduce the likelihood of liability. The desire to limit the number of lawsuits that would be necessary and to promote self-regulation is consistent with the release statute's aim of limiting individual liability and encouraging settlement.

Second, in this case as in *First Federal,* it is desirable that all contribution claims in a case be treated uniformly.

Where a federal ... law and a state law claim are based on the same tortious conduct ... it is not clear how disparate rules of contribution—barring contribution on the state and permitting it on the federal claims—would be applied to a jury's verdict awarding identical damages on both claims, unless the state bar on contribution is to be completely overridden.[6]

*First Federal,* 631 F.Supp. at 1036. This decision expresses no opinion about the appropriate setoffs to be granted Fustok on the state or federal law claims should he be found liable to Minpeco.

Fustok's challenge to the application of *First Federal* to his cross-claims is limited to an argument that the settlement should not bar his claim for contribution because it is not a fair settlement.[7] Fustok argues that, whereas the settling defendant in *First Federal* paid $3–5 million to settle a potential liability of $17 million, BPS has paid only $50,000 to settle claims of $250 million for CEA and state law claims. However, as Fustok himself notes, the settlement also includes payment of $9,450,000 for release of claims under the Clayton Act. Viewing the settlement as a whole, *First Federal,* 631 F.Supp. at 1037, it cannot be said that the settlement is unfair, and it certainly is not so unfair as to bar contribution claims. The $9.5 million Minpeco–BPS settlement, which need not as stated in *First Federal* be a "pro rata measure of damages," 631 F.Supp. at 1037, is a fair price for BPS to pay essentially to

---

**6.** Gen.Oblig.Law § 15–108(a) provides that the claims of the party against non-settling tortfeasors is reduced by the amount specified in the release given the settling tortfeasor, the amount of consideration paid for the release, or the amount of released party's equitable share of damages, whichever is greatest.

**7.** The *First Federal* court discussed what is characterized as the "fairness of settlement approach" of some courts in this circuit to the question whether a settlement barred contribution under a federal claim; the court evaluated the fairness of the settlement before concluding that contribution from the settling defendant was barred. The *First Federal* court, however, adopted the state law incorporation approach, but did note that the holding would be the same even if it had adopted the fairness approach.

buy peace in this case, whether viewed in isolation or in comparison with other settlements reached with Minpeco. Moreover, the settlement here as in *First Federal* was not made at an early stage of the litigation but was reached after six years of exhaustive preparation for trial. Although Fustok claims the settlement was not "free of collusion," Fustok Memorandum at 11, he offers no evidence to support this assertion. Accordingly, applying the rule of *Texas Industries* and the analysis of *First Federal,* Fustok's cross-claims for contribution arising under the federal claims must be dismissed.

## II. FUSTOK'S CROSS CLAIM FOR IN-DEMNITY

BPS argues that 1) even if there is a right of indemnification under federal or state law, Fustok cannot meet the legal requirements for indemnity because he is not faultless, 2) Fustok has no right to indemnity under the federal claims, and 3) any possible right to indemnity is extinguished by the settlement agreement between the plaintiff, Minpeco, and BPS.

In response, Fustok contends that 1) he may be found vicariously liable for the acts of others and thus satisfy the standards of indemnity, 2) because his right to indemnity arises from the principle of respondeat superior, not an implied right under a federal statute, it is not barred by federal law, and 3) the settlement does not constitute a basis for denying Fustok's right to indemnity prior to trial.

Exhibit D of the settlement agreement, the basis of the third argument, contains a representation and warranty that Minpeco will not seek to hold Fustok liable solely for the acts of others, *see infra* at 158, but the representation becomes effective only if BPS' motion for summary judgment would not otherwise be granted. Because it appears that Fustok could satisfy the standards of indemnity, there is no basis in law on which to dismiss the cross-claims arising under state law. Accordingly, it is necessary to rely on the representation and warranty of Minpeco.

### A.

■ A party is entitled to indemnity, as BPS maintains, if his liability is not based on his own conduct. Moreover, indemnity is available only if the indemnitee's liability arises solely by contract or operation of law. *Overseas Nat'l Airways, Inc. v. United States,* 766 F.2d 97, 102 (2d Cir. 1985); *Stamford Bd of Educ. v. Stamford Educ. Ass'n,* 697 F.2d 70, 74 (2d Cir.1982); *Boone v. Beacon Bldg Corp.,* 613 F.Supp. 1151, 1153 (D.N.J.1985). This is true because a claim for indemnity, unlike contribution, does not involve apportionment of liability. Instead, a claim for indemnification, "seeks to shift 100% of the judgment rendered against one party to another party on the ground that the other party is actually or 'primarily' responsible for the wrong." *Johnson Controls, Inc. v. Rowland Tompkins Corp.,* 585 F.Supp. 969, 973 (S.D.N.Y.1984).

Fustok does not challenge this proposition; rather, he contends that he satisfies those requirements in this case. He asserts that he may be found vicariously liable for the conduct of BPS, acting as his agent, without a finding of any wrongful conduct on his part. BPS answers that Fustok's liability can only be based on his own wrongful conduct, because liability for conspiracy (the claim against Fustok), which requires an intent to conspire, cannot be imposed vicariously.

Although there is support for the argument that, because it requires a finding that the defendant knowingly and intentionally joined the conspiracy, liability for conspiracy cannot be imposed vicariously, *cf. Massachusetts Mutual Life Insurance Co. v. Weinbach,* 635 F.Supp. 1460, 1462 (S.D.N.Y.1986) (indemnity cannot be implied in fraud action since any liability requires proof of intentional conduct), the Supreme Court has held that a principal can be liable under antitrust laws for violations its agents committed with apparent authority. *American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.,* 456 U.S. 556, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982). The principal in *American Society* was held liable 1) even though its agents

had acted solely for their own personal benefit, 2) although § 1 of the Sherman Act requires proof of conspiracy, and 3) despite the admonitions of the dissent that: "The intersection of the law of agency and vicarious liability with the law of conspiracy makes this a complex case.... It so expands the concept of vicarious liability as to leave little content, in this case, to the requirement in § 1 of the Sherman Act that antitrust plaintiffs demonstrate a contract, combination, or conspiracy." 456 U.S. at 592 n. 18, 102 S.Ct. at 1956 n. 18. *See also United States v. Koppers Co., Inc.,* 652 F.2d 290, 298 (2d Cir.) (holding that company could be criminally liable for antitrust violations for the acts of its managerial agents), *cert. denied,* 454 U.S. 1083, 102 S.Ct. 639, 70 L.Ed.2d 617 (1981).[8] In the light of these holdings sanctioning the imputation of liability where the statute's language appears to require proof of intention, the law appears not to preclude Fustok from being held liable for the acts of its agents.[9]

Moreover, the evidence marshalled by Minpeco in answer to Fustok's motion for summary judgment, as summarized in BPS' brief, does not conclusively indicate that Fustok will be found liable, if at all, only for his own wrongful conduct. Although the evidence could support a finding that Fustok was liable to Minpeco for his own wrongful conduct, *see Minpeco, S.A. v. ContiCommodity Services, Inc.,* 673 F.Supp. 684 (S.D.N.Y.1987) (denying Fustok's motion for summary judgment), the mere fact that the jury might find Fustok liable for his own acts does not exclude the possibility that the jury might find Fustok liable only for the acts of others.

In short, because neither the factual nature of Minpeco's allegations nor its claim of conspiracy bars Fustok's cross-claim for indemnity,[10] it is necessary to rely on the representation in favor of Fustok contained in Exhibit D of the Minpeco–BPS settlement agreement.

### B.

Exhibit D of the Minpeco–BPS settlement agreement contains the following provision:

Minpeco S.A. represents and warrants that it is not seeking to recover from Mahmoud Fustok [in this litigation] solely for the acts or omissions of Banque Populaire Suisse and that each of its claims against Mahmoud Fustok is based, at least in part, on the wrongful acts or omissions of Mr. Fustok. This letter may be used only in accord with the terms of the Settlement Agreement entered into between us on this date.

BPS argues that this provision eliminates any possibility that Fustok is entitled to indemnity from BPS. Fustok, in response, contends that the agreement is conjectural and ambiguous, and that it is impossible at this stage of the proceeding to anticipate the problems that may arise were it to be relied upon at trial.

■ Fustok's argument that the agreement is conjectural is without merit. Because it is necessary to rely on and con-

---

**8.** BPS' argument that these cases are inapplicable because they address the vicarious liability of *corporations,* not natural persons, is not persuasive. Although there are different considerations with corporate liability than with agency liability for a natural person, there is nothing in *American Society* indicating that the decision rested on the corporate status of the defendant.

**9.** For example, the lower court in *American Society of Mechanical Engineers* compared a conspiracy to restrain trade to fraud and found agency liability appropriate. *Hydrolevel Corp. v. American Society of Mechanical Engineers,* 635 F.2d 118, 126 (2d Cir.1980), *aff'd,* 456 U.S. 556, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982). Since a principal can be liable for the fraud of its agent, even if the fraud benefits only the agent, *Standard Surety & Casualty Co. v. Plantsville National Bank,* 158 F.2d 422, 424 (2d Cir. 1946), *cert. denied,* 331 U.S. 812, 67 S.Ct. 1203, 91 L.Ed. 1831 (1947), under this theory a principal could be liable for the conspiratorial acts of its agent.

**10.** Because Fustok could conceivably be found vicariously liable in this case, the cross-claims arising under state law cannot be dismissed, making it necessary to rely on the representation and warranty. Therefore, there is no need to decide whether there is a right to indemnity under the federal antitrust laws, RICO, and the CEA which underlie some of Fustok's cross-claims for indemnity.

strue the agreement in order to decide the current motion, Minpeco is and will remain estopped from rescinding it. *Cf. Ronson Corp. v. Liquifin Aktiengesellschaft Liquigas*, 375 F.Supp. 628, 630 (S.D.N.Y. 1974). Fustok, as a third-party beneficiary, may also sue to enforce the representation. Concern with the difficulty of drafting a jury instruction to comply with reliance on the representation is unwarranted and certainly not sufficient to justify the court's refusal to give the representation effect. The jury may be instructed simply that Fustok cannot be held liable for the acts of others; any liability must be premised at least in part on his own wrongful conduct.

Fustok's claim that the agreement is ambiguous, however, merits more discussion. Although its explicit language and the construction offered at argument definitely

prevent Minpeco from seeking to hold Fustok vicariously liable for the acts or omissions of BPS,[11] it does not specifically preclude Minpeco from holding Fustok vicariously liable for the acts of Advicorp. Fustok maintains that were he held liable for the acts of Advicorp, which BPS controls,[12] he would be entitled to indemnity from BPS.

However, even if Fustok, as a matter of law, can seek indemnification from BPS if held vicariously liable for Advicorp,[13] the representation and warranty is construed to bar Minpeco from seeking to hold Fustok vicariously liable for the acts of either BPS or Advicorp.[14] This construction is amply supported by the language of the representation and the interpretation as offered by BPS and Minpeco. The representation states that each of Min-

11. At oral argument, when speaking of the representation, BPS stated that the representation "was intended by both parties to cut off Fustok's vicarious liability to Minpeco and thereby eliminate any right to indemnification that he might have against the bank." Transcript of Oral Argument at 6 (October 6, 1987) ("Oral Argument").

12. BPS has not in its papers disputed Fustok's assertions that BPS controls Advicorp and the assertion must be assumed true for the purpose of this motion.

13. BPS argues that Fustok cannot, if held vicariously liable for the acts of Advicorp, seek indemnity from BPS. However, in the cases BPS cites, the indemnity claims were dismissed not because liability cannot as a matter of law shift from one vicariously liable party to another; the claims were dismissed because, given the facts of those cases, there were no viable claims for indemnity because the claims were properly for contribution or because liability for the party seeking indemnity would be based on the party's own acts or omissions. *See Jordan v. Madison Leasing Co.*, 596 F.Supp. 707, 709 (S.D. N.Y.1984) (dismissing third-party plaintiffs' claims for indemnification because claims against third-party plaintiffs were based on their own acts or omissions, not on their relation to the third-party defendants); *Johnson Controls, Inc. v. Rowland Tompkins Corp.*, 585 F.Supp. 969, 973 (S.D.N.Y.1984) (dismissing third-party plaintiff's claims for indemnity because potential liability would not be solely for the wrongdoing of the third-party defendant or on the basis of imputed or vicarious liability); *Westchester Co. v. Welton Becket Assoc.*, 102 A.D.2d 34, 478 N.Y.S.2d 305, 314–15 (1984), *aff'd*, 66 N.Y.2d 642, 495 N.Y.S.2d 364, 485 N.E.2d 1029

(1985) (dismissing indemnity claim because party could only properly seek contribution). In this case it cannot be said, as BPS contends, that Fustok's cross-claims for indemnification are confused claims for contribution. At this point, prior to trial, it is impossible without application of the settlement agreement's special provision to rule out that Fustok could be found vicariously liable for the acts of BPS or Advicorp and thus have a basis for indemnity. Moreover, the fact that one can seek indemnity only from the actual wrongdoer, *Westchester*, 478 N.Y.S.2d at 314, does not, as BPS contends, support dismissal of Fustok's cross-claims against BPS at this time. It cannot now be known, if Fustok were to be held vicariously liable for the acts of Advicorp, whether Advicorp and not BPS would be found the actual wrongdoer.

14. This construction of the representation and warranty—holding that Minpeco cannot seek to hold Fustok liable solely for the acts of BPS or Advicorp—is not, as argued by Fustok at oral arguments, inconsistent with the conspiracy charge. Oral Argument at 10–11, 18–19. Fustok has confused the liability for coconspirators with vicarious liability. Liability for conspirators, although premised on one's relationship with other members of the conspiracy, is based on one's own participation in the conspiracy and a principle of law that a conspirator should be liable for the acts of her or his confederates who are furthering a common plan. Liability for the acts of coconspirators is joint and several. *Kashi v. Gratsos*, 790 F.2d 1050, 1054–1055 (2d Cir.1986). Vicarious liability, in contrast, involves shifting of full responsibility to a blameless party, based on the party's relationship or policy considerations.

peco's claims "against Mahmoud Fustok is based, at least in part, on the wrongful acts of omissions of Mr. Fustok." Although as stated above, *see supra* at 158, it does not necessarily follow that because Minpeco is seeking liability based in part on Fustok's own conduct a jury determination of liability will be premised on Fustok's wrongful acts or omissions, BPS and Minpeco have indicated that the clause "eliminat[es] all vicarious liability on [Fustok's] part." Letter from Brooksley Born at 4 (October 19, 1987). When asked for clarification about the representation, Minpeco stated, "What we were saying in that letter is that we are not holding him [Fustok] responsible if he took no acts of his own, that is all. In other words, if he took no acts of his own and his liability is solely vicarious by reason of some respondeat superior [or] agency law, we are not trying to hold him for that...." Transcript of Hearing (October 7, 1987) at 225–26. Minpeco's statements that it is "not asserting ... a vicarious liability against Mr. Fustok," Oral Argument at 13, sufficiently address the ambiguity that concerned Fustok. The representation and warranty, by its language and intent, precludes any recovery by Minpeco from Fustok based solely on the acts or omissions of either BPS or Advicorp. Accordingly, Fustok's cross- claims for indemnification are dismissed.

In sum, Fustok's cross-claims for contribution arising under state law are barred by § 15–108 of New York General Obligations Law; under federal law, there is no right to contribution for claims arising under the federal antitrust statutes or RICO; and under the principles of *First Federal,* the claim for contribution under the CEA must be dismissed. On the basis of the representation and warranty of Minpeco, made in its settlement agreement with BPS, the cross-claims for indemnification are also dismissed.

BPS' motion for summary judgment, dismissing Fustok's cross-claims, is granted.

It is so ordered.